**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JAMES FEINSTEIN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:17-cv-794- |
| v. | ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND** |
| STONEGATE MORTGAGE CORPORATION, RICHARD A. KRAEMER, KEVIN BHATT, JAMES BROWN, SAM LEVINSON, RICHARD A. MIRRO, and SCOTT MUMPHREY, | ) ) ) ) ) ) ) | **20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

Plaintiff James Feinstein ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Stonegate Mortgage Corporation ("Stonegate" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Stonegate, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Merger") between Stonegate, Home Point Financial Corporation ("Parent") and Longhorn Merger Sub, Inc. ("Merger Sub," and together with Parent, "Home Point").

2.      On January 26, 2017, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive $8.00 in cash for each share of Stonegate common stock they own (the "Merger Consideration").

3.      On February 28, 2017, in order to convince Stonegate shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a materially incomplete and misleading Schedule 14a Proxy Statement (the "Proxy Statement") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      The Proxy Statement purports to set forth the basis on which the Board is recommending the Proposed Merger and soliciting shareholders to vote in favor of the Proposed Merger.

5.      While Defendants tout the fairness of the Merger Consideration to the Company's shareholders in the Proxy Statement, they have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading.

6.      In particular, the Proxy Statement contains materially incomplete and misleading information concerning: (i) financial projections for the Company (including GAAP to Non-GAAP reconciliation mandated by the SEC) relied on by the Board to recommend the Proposed Merger; (ii) the sales process conducted by the Board, including restrictions contained in confidentiality agreements with other bidders that may continue unlawfully to restrict competing superior bids for the Company; and (iii) summary of the valuation analyses performed by the Company's financial advisor, Barclays Capital, Inc. ("Barclays"), in support of its fairness opinion.

7.      On March 13, 2017, Defendants established April 27, 2017 as the date for the special

shareholder meeting to vote on the Proposed Merger.[1]

8.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from consummating the Proposed Merger or in the event the Proposed Merger is consummated, recover damages resulting from the Individual Defendants' violations Sections 14(a) and 20(a) of the Exchange Act.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

10.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Stonegate maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

---

[1]     www.sec.gov/Archives/edgar/data/1454389/000119312517080543/d354958dex991.htm.

12.     Plaintiff is, and at all relevant times has been, a Stonegate shareholder.

13.     Defendant Stonegate is an Ohio corporation and maintains its principal executive offices at 9190 Priority Way West Drive, Suite 300, Indianapolis, Indiana 46240.  Stonegate's common stock trades on the New York Stock Exchange under symbol "SGM".

14.     Individual Defendant Richard A. Kraemer has served as a director of the Company since May 2013 and is Chairman of the Board.

15.     Individual Defendant Kevin Bhatt has served as a director of Company since February 2012.

16.     Individual Defendant James Brown has served as a director of the Company since February 2012.

17.     Individual Defendant Sam Levinson has served as a director of the Company since May 2013.

18.     Individual Defendant Richard A. Mirro has served as a director of the Company since February 2012.

19.     Individual Defendant Scott Mumphrey has served as a director of the Company since February 2010.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Stonegate (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

21.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. As of

4

January 26, 2017, there were approximately 25,854,022 shares of Stonegate common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of public shareholders of Stonegate will be ascertained through discovery.

b.  There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following

      i.  Whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

      ii.  Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

      iii.  Whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy

c.  Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct

for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy

## SUBSTANTIVE ALLEGATIONS

### I.      The Merger Consideration Appears to be Inadequate

22.     Stonegate was founded in 2005 and operates as a non-bank mortgage company focused on originating, financing and servicing U.S. residential mortgage loans. It acts as an intermediary between residential mortgage borrowers and the ultimate investors of mortgages through originating, financing, and servicing U.S. residential mortgages.  Stonegate originates loans through a network of third party originators consisting of mortgage brokers, mortgage bankers and financial institutions (banks and credit unions), a retail branch network and a direct to consumer call center.

23.     The Company predominantly transfers mortgage loans into pools of Government National Mortgage Association ("Ginnie Mae" or "GNMA") mortgage backed securities ("MBS") and sells mortgage loans to the Federal National Mortgage Association ("Fannie Mae" or "FNMA") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "FHLMC"). Both FNMA and FHLMC are considered government-sponsored enterprises ("GSEs").  The Company typically retain the right to service the mortgage for GNMA, FNMA and FHLMC.  Stonegate also sells mortgage loans to over a dozen other third-party investors in the secondary market and provide short-term financing through its NattyMac, LLC ("NattyMac") subsidiary to third party

correspondent lenders. As of December 31, 2016, the Company was licensed to originate and service residential mortgage loans in 48 states and the District of Columbia, and is an approved Seller/Servicer of FNMA, FHLMC and GNMA.[2]

24.   The Proposed Merger was announced on January 27, 2017:

***Home Point Financial to Acquire Stonegate Mortgage Corporation***
*All-cash transaction valued at approximately $211 million; Stonegate Mortgage shareholders to receive $8.00 per share in cash*

ANN ARBOR, MI and INDIANAPOLIS, IN -- (Marketwired) -- 01/27/17 -- Home Point Financial Corporation ("Home Point") and Stonegate Mortgage Corporation (NYSE: SGM) ("Stonegate Mortgage") today announced that they have entered into a definitive agreement for Home Point to acquire Stonegate Mortgage in an all-cash transaction valued at approximately $211 million. On a pro forma basis, the acquisition would position Home Point as a top-25 mortgage originator and servicer.
Under the terms of the agreement, Stonegate Mortgage's stockholders will receive $8.00 per share. The per share price represents a premium of approximately 61 percent over Stonegate Mortgage's 90-day volume weighted average price on January 26, 2017, and a 34 percent premium over Stonegate Mortgage's closing price per share on January 26, 2017.

"We are very excited about the opportunity to work together with the Stonegate Mortgage team to accelerate the build out of Home Point Financial," said Willie Newman, Home Point's Chief Executive Officer. "The combined business will have full national coverage across all channels of mortgage origination, as well as vertical integration across the mortgage value chain. Most important, the talent and experience of the combined team will give us the ability to fulfill Home Point's vision of being a leader in mortgage banking and financial services."

Jim Smith, Chief Executive Officer of Stonegate Mortgage, commented, "The combination of Stonegate Mortgage and Home Point Financial creates an exciting opportunity for our company, our associates and our customers. We look forward to joining forces with the Home Point Financial team and building a best in class mortgage origination and servicing platform focused on delivering value to our customers."

   ***Additional Transaction Details***

---

[2]      Form 10-K, www.sec.gov/Archives/edgar/data/1454389/000145438917000006/ a201610k.htm#s1EDBC575FC445AC5B111D3D716BA3A81.

Stonegate Mortgage's board of directors unanimously approved the transaction following a comprehensive review of the transaction and strategic alternatives. The transaction is subject to certain customary closing conditions, including, among other things, approval by Stonegate Mortgage's stockholders and regulatory approvals. The transaction is expected to close by the end of the second quarter of 2017.

Certain stockholders, directors and executive officers of Stonegate Mortgage with the power to vote approximately 36 percent of Stonegate Mortgage's outstanding common stock have entered into voting and support agreements with Home Point to vote in favor of, and otherwise support, the transaction.

Houlihan Lokey acted as financial advisor to Home Point, and Kirkland & Ellis LLP acted as legal counsel to Home Point.

Barclays and FBR Capital Markets & Co. acted as financial advisors to Stonegate Mortgage, and Sullivan & Cromwell LLP acted as legal counsel to Stonegate Mortgage.

### *Tax Asset Protection Plan*

In connection with the transaction, Stonegate Mortgage additionally announced today that its Board of Directors has adopted a Tax Asset Protection Plan (the "Plan"), which is designed to protect Stonegate Mortgage's tax assets during the period prior to the closing of the proposed merger between Stonegate Mortgage and Home Point (the "Proposed Merger"). This Plan is similar to tax benefit protection plans adopted by other public companies with significant tax attributes. As of September 30, 2016, Stonegate Mortgage had U.S. federal net operating loss carryforwards of approximately $163.5 million.

Home Point's ability to use the tax attributes of Stonegate Mortgage may be significantly limited if there were an "ownership change" (as defined under Section 382 of the Internal Revenue Code) prior to the closing of the Proposed Merger. In general, an ownership change occurs if there is a cumulative change in the ownership of Stonegate Mortgage by "5 percent stockholders" that exceeds 50 percentage points over a rolling three-year period.

As part of the Plan, the Stonegate Mortgage Board of Directors today declared a dividend of one preferred share purchase right for each outstanding share of Stonegate Mortgage's common stock. The rights will be distributable to stockholders of record as of February 6, 2017, as well as to holders of Stonegate Mortgage's common stock issued after that date.

The Plan is designed to reduce the likelihood that Stonegate Mortgage will experience an ownership change prior to the closing of the Proposed Merger by

discouraging any person from acquiring beneficial ownership of 4.9 percent or more of Stonegate Mortgage's outstanding common stock.

Existing stockholders holding 4.9 percent or more of Stonegate Mortgage's outstanding shares of common stock are exempt from the provisions of the Plan unless they make additional purchases. Stonegate Mortgage's Board of Directors also has the discretion under certain circumstances to exempt acquisitions of Stonegate Mortgage's securities from the provisions of the Plan and can redeem the rights issued pursuant to the Plan. The issuance of the rights will not affect Stonegate Mortgage's reported earnings per share and is not taxable to Stonegate Mortgage or its stockholders.

Additional information regarding the Plan will be contained in a Form 8-K and in a Registration Statement on Form 8-A that Stonegate Mortgage is filing with the Securities and Exchange Commission.[3]

25.     Stonegate's stock has demonstrated growth in the last year. The Merger Consideration Stonegate shareholders stand to receive if the Proposed Merger is consummated appears to inadequately compensate them for their shares. Therefore, Stonegate's shareholders should be provided with sufficient information in the Proxy Statement to make an informed decision regarding the Proposed Merger.

26.     The Merger Consideration offered to Stonegate's public stockholders in the Proposed Merger is unfair and inadequate because, among other things, the intrinsic value of the Company's common stock is materially in excess of the amount offered for those securities in the proposed acquisition given the Company's prospects for future growth and earnings. The Proposed Merger will deny Class members their right to fully share equitably in the true value of the Company.

27.     For example, on November 3, 2016, Stonegate reported wherein it reported its third quarter 2016 financial results that included the following: (i) total revenues during the third quarter were $66.3 million, up $39.8 million, or 150%, compared to the second quarter of 2016, and a year-

---

[3]     http://investors.stonegatemtg.com/releasedetail.cfm?ReleaseID=1009445.

over-year increase of 159%; (ii) net income from continuing operations of $15.6 million, or $0.60

per diluted share, compared to a net loss from continuing operations of $17.2 million, or $0.66 per

diluted share, in the second quarter of 2016; (iii)  adjusted net income from continuing operations

was $11.0 million, or $0.42 per diluted share, compared to reported adjusted net income from

continuing operations of $1.0 million, or $0.04 per diluted share, for the second quarter of 2016,

and year-over-year was up $8.2 million, or $0.31 per diluted share, compared to the third quarter of

2015, of $2.8 million, or $0.11 per diluted share.[4]

28.     The Individual Defendant Smith stated :

> We are extremely pleased to report strong GAAP and adjusted net income
> for the third quarter[.] Our business platform was well prepared to benefit
> from increased production levels during the quarter and, as a result, we
> achieved GAAP earnings of $15.6 million and adjusted net income of $11.0
> million. We continue to be highly focused on maintaining prudent liquidity
> and MSR debt levels, as well as fully leveraging our cost structure. Thanks
> to the dedication and commitment of our associates and the support of our
> many customers, Stonegate continues to deliver value to our shareholders.[5]

29.     For the fourth quarter 2016 and year end 2016 results, the Company reported the

following highlights from operations:  (i) revenues increased 18% to $78.2 million in the fourth

quarter of 2016 from $66.3 million in the third quarter of 2016, and increased 67% from $46.8

million in the fourth quarter of 2015; (ii) net income from continuing operations, net of tax for the

fourth quarter of 2016 was $36.0 million, or $1.39 per diluted share, compared to net income

of $15.6 million, or $0.60 per diluted share, in the third quarter of 2016 and net income of $1.1

million, or $0.04 per diluted share, in the fourth quarter of 2015 (net loss for the full year 2016

was $3.1 million, or $0.12 per diluted share, compared to net loss of $16.2 million, or $0.63 per

diluted share, for the full year 2015); (iii) adjusted net income from continuing operations of $1.6

---

[4]       http://investors.stonegatemtg.com/releasedetail.cfm?ReleaseID=997303.
[5]       *Id.*

million, or $0.06 per diluted share, for the fourth quarter of 2016, after excluding pre-tax non-cash mortgage servicing rights valuation adjustments of $36.1 million and adding certain other pre-tax non-cash expense items and other non-routine expenses; and (iv) adjusted net income from continuing operations of $11.0 million, or $0.42 per diluted share, for the third quarter of 2016 and $1.2 million, or $0.05 per diluted share, for the fourth quarter 2015 (full year 2016 adjusted net income from continuing operations was $10.6 million, or $0.41 per diluted share: full year 2015 adjusted net income was $10.7 million, or $0.42 per diluted share).[6]

30.     Nevertheless, on January 26, 2017, the Board caused the Company to enter into the Merger Agreement, pursuant to which Stonegate will be acquired for inadequate consideration.

31.     The inadequate Merger Consideration is the result of a flawed sales process. Specifically, the Proxy Statement indicates that the Board did little to genuinely search for strategic alternatives to maximize shareholder value with other parties, and appears to have sought to prevent other parties from submitting topping bids through restrictive and unlawful deal protection terms in the confidentiality agreements (*see e.g.,* Proxy Statement, pp. 14, 70, 27).  The Board also agreed to restrictive deal protection devices, *e.g.,*  a non-solicitation provision (Merger Agreement, ¶6.9), and termination fee of $7.25 million (Merger Agreement, ¶8.1).

32.     The consideration to be provided to Plaintiff and the Class in the Proposed Transaction is inadequate.

33.     Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

34.      Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable

---

[6]     http://investors.stonegatemtg.com/releasedetail.cfm?ReleaseID=1016689.

business, and future growth in profits and earnings.

## II.     The Materially Incomplete and Misleading Proxy Statement

35.     On February 28, 2017, Defendants caused the material incomplete and misleading Proxy Statement to be filed with the SEC.  The information contained in the Proxy Statement has thus been disseminated to Stonegate shareholders to solicit their vote in favor of the Proposed Merger.  The Proxy Statement omits certain material information concerning the fairness of the Proposed Merger, Merger Consideration, and the summary of Barclays work and opinion of the fairness of the Proposed Merger.[7] Without such information, Stonegate shareholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Merger.

36.     First, the "Unaudited Prospective Financial Information" section of the Proxy Statement (pp. 42-44) fails to provide material information concerning the Company's financial projections from 2016-2020.  Specifically, the Proxy Statement provides projections for non-GAAP financial metrics including Adjusted Net Income, and Adjusted Earnings Per Share, but fails to disclose the line-item projections for the specific metrics, adjustments and/or inputs that are used to calculate these Non-GAAP financial measures, including valuations of the Company's mortgage servicing rights, stock-based compensation expense, certain non-recurring expenses, and the tax effect of adjustments, as well as a reconciliation with the most directly comparable financial measures calculated and presented in accordance with GAAP.

37.     Moreover, the Company entered into the Tax Asset Protection Plan to ensure Home Point could utilize the nearly $163.5 million in net operating losses. To the extent these NOLs and the tax benefits were projected out and relied on by the Board and/or Barclays, the projected NOL

---

[7]     The Proxy Statement also fails to report material information concerning the engagement of  FBR Capital Markets & Co. ("FBR"), *e.g.*, FBR's services rendered, its fee, and prior engagements and/or work for the Company, Home Point and/or any subsidiaries or affiliates for the past two years as required by SEC regulations. *See e.g.,* Proxy Statement, pp. 27-28.

and/or tax asset must be disclosed.

38.     The Proxy Statement provides that the Board relied on these projections to recommend the Proposed Merger and to solicit stockholders to vote in favor of the Proposed Merger. Proxy Statement, at 39-40.  Therefore, this information is material to shareholders to weigh the solicitation statement and must be disclosed.

39.     When a company discloses information to solicit votes in a Proxy Statement that includes non-GAAP financial measures, the Company must also disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information.  17 C.F.R. § 244.100.

40.     Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  Former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as the Company has included in the Recommendation Statement here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[8]

---

[8]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-

37.     In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heighted its scrutiny of the use of such projections.[9]   Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[10]   One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide *any* reconciling metrics that are available without unreasonable efforts.

38.     The above-referenced line item projections that have been omitted from the Proxy Statement for Stonegate are precisely the types of "reconciling metrics" that the SEC has recently indicated should be disclosed to render non-GAAP financial projections not misleading to shareholders.

39.     The omission of the line item projections used to calculate the various non-GAAP measures included in the Proxy Statement and/or the most directly comparable GAAP measures, renders the projections disclosed in the Proxy Statement  materially incomplete and misleading.

40.     The Proxy Statement also omits certain key inputs necessary for shareholders to assess the valuation analyses performed by Barclays in support of its fairness opinion, rendering the summaries of such analyses in the Proxy Statement incomplete and misleading.

---

speech.html.

[9]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[10]     *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

41.     For example, with respect to  Barclays' *Selected Comparable Public Company Analysis* (Proxy Statement, p. 47), the Proxy Statement fails to disclose the individual multiples and financial metrics for each company analyzed. The omission of the individual multiples for each company renders the summary of these analyses and the implied per share equity value reference ranges set forth on page 48 of the Proxy Statement materially misleading.  A fair summary of a Selected Comparable Public Company Analysis requires the disclosure of the individual multiples for each company –  merely providing the range that a banker applied is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.

41.     With respect to Barclays' *Dividend Discount Analysis* (Proxy Statement, 48), the Proxy Statement fails to disclose the assumptions underlying the selection of cost of equity rate of 12% to 19.5% and the exit multiples of book value of 0.8% to 1% used for Stonegate.  The failure to disclose this material information renders the implied equity value per share ranges by Barclays misleading.

42.     Finally, the Proxy Statement fails to disclose whether any  non-disclosure agreement between Stonegate  and a potential bidder (*e.g.,*  Party A, Proxy Statement, p. 27), contained a standstill provision that acts to prohibit the party from improving its offer, or from even requesting a waiver a standstill provision (a "Don't Ask, Don't Waive" ("DADW") provision) and whether the standstill provision still is in effect or whether, as is required, the standstill clause was terminated once Stonegate and Home Point entered into the Merger Agreement.

43.     In sum, the omission of the above-referenced information renders statements in the Proxy Statement materially incomplete and misleading, in contravention of the Exchange Act.

Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the 1934 Act, Rule 14a-9 and 17 C.F.R. §244.100 Promulgated Thereunder)**

44.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

45.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1)

46.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

47.     SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement.  The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying

16

that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading*." 17 C.F.R. § 244.100(b).  The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).  As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

48.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

49.     Defendants have issued the Proxy Statement with the intention of soliciting shareholder support for the Proposed Merger.  Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; (ii) information regarding the confidentiality agreements, and (iii) the valuation analyses performed by Barclays, as described above.

50.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such

information to shareholders although they could have done so without extraordinary effort.

51.     The Individual Defendants knew or were negligent in not knowing that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy Statement states that Barclays reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Barclays as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and knew or should have known that a confidentiality agreement with a standstill provision that does not "fall away" on entering in the Proposed Merger is unlawful.

52.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review Barclays' analyses in connection with their receipt of the fairness opinion, question Barclays as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

53.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes

negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

54.     Stonegate is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy Statement.

55.     The misrepresentations and omissions in the Proxy Statement are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

56.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for Violations of Section 20(a) of the 1934 Act)

57.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58.     The Individual Defendants acted as controlling persons of Stonegate within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Stonegate, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially

incomplete and misleading.

59.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

60.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing this document.

61.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

62.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

63.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably

harmed.

64.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action may be maintained as a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

B.      Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy Statement as described and alleged herein;

C.      Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: March 15, 2017                          **SHARTZER LAW FIRM, LLC**

                                               By:   */s/ Jason A. Shartzer*
                                                     Jason A. Shartzer
**OF COUNSEL:**                                      Attorney No. 23989-49
                                                     156 East Market Street
**FARUQI & FARUQI, LLP**                             Suite 1000
Nadeem Faruqi                                        Indianapolis, IN 46204

James M. Wilson, Jr.
685 Third Avenue, 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331
Email: nfaruqi@faruqilaw.com
          jwilson@faruqilaw

Tel: (317) 969-7600
Fax: (317) 969-7650
E-mail: jshartzer@shartzerlaw.com

*Attorneys for Plaintiff*

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Tel: (212) 971-1341
E-mail: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*